No. 13-40326
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

MC ALLEN GRACE BRETHREN CHURCH, ET AL.,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF INTERIOR,
SECRETARY OF INTERIOR KENNETH SALAZAR,

Defendant, Appellee.
_____

On appeal from the United States District Court for the Southern District of Texas,
McAllen Division, D.C. No. 7:07cv60
_____

## BRIEF OF APPELLANTS,
## MC ALLEN GRACE BRETHREN CHURCH, ET AL.
_____

CIVIL RIGHTS LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.
MILO L. COLTON
129 Whitney Way
Cibolo, Texas 78108
Tel: (210) 658-8539
Fax: (210) 492-1601
ATTORNEY FOR APPELLANTS,
MC ALLEN GRACE BRETHREN CHURCH, ET AL.

**ORAL ARGUMENT IS WAIVED**

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants:**

1. Mc Allen Grace Brethren Church

2. Native American New Life Center

3. San Antonio Indian Fellowship

4. South Texas Indian Dancers Association

5. Linda Cleveland

6. Michael Russell

7. Veronica Russell

8. Edith Clark

9.  William Clark

10. Carrie Felps

11. Homer Hinojosa, III

12. Nancy Hollingworth

13. Lucian Oden

14. Xavier Sanchez

15. Pastor Robert Soto

Counsel to Plaintiffs-Appellants on Appeal and in District Court:

16. Milo Lone-Eagle Colton – Civil Rights Legal Defense and Educational Fund, Inc., 129 Whitney Way, Cibolo, Texas 78108

Counsel to Plaintiffs-Appellants in District Court:

17. Marisa Y. Salazar – Civil Rights Legal Defense and Educational Fund, Inc., 129 Whitney Way, Cibolo, Texas 78108

**Defendants-Appellees**

18. Kenneth Salazar - Secretary of the United States Department of Interior, in his official capacity.

Counsel to Defendant-Appellee on Appeal and in District Court:

19. Jimmy Rodriguez, Assistant United States Attorney, Southern District of Texas, 919 Milam, Ste. 1500, P.O. Box 61129, Houston, Texas 77208

20. Jose Angel Moreno, United States Attorney, Southern District of Texas, 919 Milam, Ste. 1500, P.O. Box 61129, Houston, Texas 77208

s/Milo L. Colton
Milo L. Colton

## Statement Regarding Oral Argument

The major issue in this appeal is whether an American Indian not enrolled in a federally recognized tribe can practice an American Indian religion, using and possessing eagle feathers that are central and essential to the religion. The answer to the issue presented turns on whether the First Amendment right to religious freedom is fairly and justly applied to all American Indians or whether religious freedom is just for American Indians with the good fortune to be born into qualifying for the political affiliation of enrollment in a federally recognized tribe. Each party will present in their brief all reasons for religious freedom to apply in the manner they are advocating; therefore Plaintiffs believe oral argument is not necessary and waive it.

# Table of Contents

Certificate of Interested Persons…………………………………………………ii

Statement Regarding Oral Argument………………………………………..iv

Table of Contents………………………………………………………....v

Index of Authorities………………………………………………………vi

Statement of Jurisdiction…………………………………………………1

Statements of Issues…………………………..………………………..2

Statement of the Case……………………………………………………3

    A.    Course of Proceedings and Disposition in the Court Below……......3

    B.    Statement of Facts…………………………………....…………...7

        1.    The Petitioners………………………………….……....…7

        2.    The Powwow…………………………………..……….8

        3.    The Government's Stipulation……………………………9

        4.    Motion for Summary Judgment…………………..……..8

Summary of Argument………………………..………………….……..8

Argument and Authorities…………………..………………….………9

    Standard of Review…………………………………..……………...9

The Government's action violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA)…….………14

    1. The government's regulation substantially burdens the appealing Indians' free exercise of religion………………………………….……………18

2. The government's interest in protecting eagle populations is not compelling under RFRA or the First Amendment…………..…………23

3. The government's asserted compelling interest in preserving American Indian culture and religion for federally-recognized Indians is contradicted by its regulation prohibiting the use of bird parts for religious purposes by a majority of American Indians……………………………...……………27

4. The government's definition of American Indian violates RFRA and the First Amendment when it enforces the BGEPA and MBTA concerning the use of eagle feathers considered essential and central to the practice of the American Indian religion…………………………………..………………..28

Discussion of Indian Definitions………………………..……………….....…..32

A. The U.S. Decennial Census Definition of American Indian…………32

B. A Definition of American Indian as Enrolled in a Federally- Recognized Tribe……………………………………..……………………….…………...35

Significant Historical Background…………………………………………………39

Conclusion……………………………………………………………….………40

Prayer……………..…………………………………………………….……42

Certificate of Service……………………………………………………….……44

Certificate of Compliance…………………..…………………………..……...……45

## Index of Authorities

## PRINCIPAL CONTROLLING AUTHORITIES

## Cases

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,

611 F.3d 248 (5th Cir. 2010)..……………………………..………14, 16, 18, 40

*Bailey v. Morales*, 190 F.3d 320 (5th Cir. 1999)…………………….………….11

*City of Boerne v. Flores,*

521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed.2d 624 (1997)………………………17

*Cutter v. Wilkinson,*

544 U.S. 709, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)……………..…….17

*Employment Division, Department of Human Resources of Oregon v. Smith,*

494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)………..…………..16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*

546 U.S. 418, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006)…………….….…42

*Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.,*

389 F.3d 491 (5th Cir. 2004)…………….………………………………………11

*Santa Clara Pueblo v. Martinez,*

436 U.S. 49, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978)………………………...38

*Sherbert v. Verner,*

374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963)..………………….…...16

*U.S. v. Wilgus,*

297 F. 3d 116 (10th Cir. 2002)…………………………………………..23, 27, 41

*Williams v. Kaufman County,*

352 F.3d 994 (5th Cir. 2003)……………………………………….……………11

*Wisconsin v. Yoder*,

406 U.S. 205, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972)……………..…………………17

**Constitutional and Statutory Authorities**

U.S. Const. amend. I……………………....……1-6, 11, 12, 14, 16, 23, 28, 42, 43

42 U.S.C. § 2000bb……………..……………..……………………………..…1, 16

42 U.S.C. § 2000bb(b)(1)…………………………………………………1, 16, 17

16 U.S.C. § 1371……..……………………………………………..………..7, 13

16 U.S.C. § 1372………………………………………………………………13

25 C.F.R. Part 11………………………………………………………..……….12

**Other Authorities**

Alaska Trekker, *Alaska's Bald Eagles: Eagles are as common as pigeons in Southeast Alaska, available at* http://alaskatrekker.com/eagles.htm. (last visited Feb. 24, 2012).......................................................................................................24

*The American Indian and Alaska Native Population: 2000*, U.S. Census Bureau, Feb. 2002, p. 2……………..…………..…………………………...……..…………33

Clinton, Robert, *American Indian Law: Cases and Materials* (Third Edition), Michie Company, Inc., 1991………………………………………………….......25

Clinton, Robert, "Code of Indian Offenses," Section on *History of Federal Indian Policy, Indian Law*, February 24, 2008, *available at* http://rclinton.wordpress.com/2008/02/24/code-of-inidan-offenses/, (last visited Apr. 12, 2013)………..………….…..………………………12, 39

Draper, Electra, *"Eagle bodies, parts for Indian rites are collected, sent from Colo. Morgue," The Denver Post,* Posted Sep. 1, 2001, p. 1. *available at* http://www.denverpost.com/ci_13242945, (last visited Feb. 27, 2012).................21

*Federal Register* Notice, October 30, 1997, "Revisions to the Standards
for the Classification of Federal Data on Race and Ethnicity," Executive
Office of President, Office of Management and Budget (OMB), Office
of Information and Regulatory Affairs…………………………………………4, 5, 28

Indian County Today, McNeel, Jack, *Coeur d'Alene Elders View Golden Eagle
Release*, Oct. 14, 2011, p. 3. Available at
http://indiancountrytodaymediannetwork.com/2011/10/14/coeur-dallllene-elders-
view-eagle-release-58412#ixzzinJZvbyNS, (last visited Dec. 24, 2012)……….24

*Indian Labor Force Report*, Office of Tribal Affairs, Bureau of
Indian Affairs, U.S. Department of Interior, 1999………………………………33

Daily Kos Group, Jun. 7, 2012 *"Indians 201: Indians, Eagles and the Law, Native
American Netroots,"* available at
http://www.dailyko.com/story/2012/06/07/1098233/-Indians-201-Indians-Eagles-
and-the-Law, (last visited Apr. 4, 2013)…………………………………...…11, 13

Kstrom, Johnson, Troy, *"U.S. Federally Non-Recognized Indian Tribes—Index by
State,"* available at http://www.kstrom.net/isk/maps/tribesnonrec.html (last visited
Apr. 5, 2013)……………………………………………………………………...35

*Rules Governing the Court of Indian Offenses*, Department of Interior, Office
of Indian Affairs, March 30, 1883, and Price, Hiram, Commissioner of Indian
Affairs, Department of Interior Letter, December 2, 1882…………………..…….11

*San Antonio Express-News*, "Feds allow tribe to kill two eagles," March 14,
2012, P. A3……………………………………..…………………..……………10, 23

Stokes DaShanne, "Eagle feathers and the imperialist conquest of state-recognized
tribes," *Indian Country Today*, p. 5, 8-13-08………………..………..……13, 21

Texas Senate Resolution 438 and Texas House of Representative Resolution 812,
(Recognizing Lipan Apache Tribe of Texas)…………..………………………..5

Thornton, Russell, *American Indian Holocaust and Survival: A Population
History Since 1492*, University of Okahoma Press, 1987……..………..……36, 37

Thornton, Russell, *The Cherokees: A Population History*, University of Nebraska
Press, Lincoln, NE, 1990, p. 140-141………………………….……………36, 37

Great Dreams, Apache Indian Rights *"War on feathers: fruitless drug raid becomes federal holy war,"* available at http://www.greatdreams.com/apache-indian-rights-2001.htm (last visited May 3, 2013)..………...........................35

Woodward, Stephanie, "Eagles E.R.," *Indian Country Today*, October 17, 2012, pp. 28-31…………..………………………………………………………26

## Statement of Jurisdiction

Mc Allen Grace Brethren et al. appeals a final judgment from the United States District Court for the Southern District of Texas, Mc Allen Division. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## Statement of Issues

1.  Whether the government's policy excluding Petitioners and hundreds of thousands of other Indians, for lack of enrollment in a federally recognized tribe, from the use of eagle feathers and bird parts central and essential to practicing their religion, violates Petitioners' right to freely exercise their Indian religion as protected under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).[1]

2.  Whether the government's policy excluding Petitioners and hundreds of thousands of other Indians, for lack of enrollment in a federally recognized tribe, from the use of eagle feathers and bird parts central and essential to practicing their religion, substantially burdens Petitioners' right to freely exercise their Indian religion as protected under the Free Exercise Clause of the First Amendment and the RFRA.

3.  Whether the government's policy basis of protecting eagle populations to the extent of prohibiting Petitioners from using eagle feathers and bird parts

---

[1] 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*

central and essential to the practice of their religion, although Petitioners' engage a no-kill policy and pre-policy eagle populations showed no decrease in eagle populations, meets the strict scrutiny analysis for a "compelling governmental interest" under the Free Exercise Clause of the First Amendment and RFRA.

4.  Whether government's policy basis of protecting American Indian religion and culture to the extent of prohibiting Petitioners and hundreds of thousands of other Indians from using eagle feathers and bird parts central and essential to the practice of their religion meets the strict scrutiny analysis for a "compelling governmental interest" under the Free Exercise Clause of the First Amendment and RFRA.

5.  Whether, in the enforcement of the BGEPA and the MBTA, government's failure to employ the statutorily prescribed definition of Indian and the government's use instead of an American Indian as a person enrolled in a federally recognized tribe violates RFRA and the First Amendment by criminalizing Petitioners and hundreds of thousands of non-enrolled Indians if they use eagle feathers considered essential and central to American Indian beliefs and practices.

## Statement of the Case

## A. Course of Proceedings and Disposition in the Court Below.

Petitioners commenced this action to obtain a declaration of rights that government's policies and practices violate the Free Exercise Clause of the First Amendment and RFRA. Petitioners also moved for an order of the U.S. District Court permanently enjoining government from engaging in its illegal efforts to ban American Indian religious practices in the future.

Petitioners asserted that they are American Indians as defined by federal and state law. In 2006, they were conducting an American Indian religious event called a powwow. Eagle feathers considered central and essential to American Indian religious rites, ceremonies, activities, and practices associated with the powwow were in the possession of and worn by powwow participants, including Petitioners Rev. Robert Soto and his brother-in-law Michael Russell.

As Petitioners' Amended Complaint alleged and documents abundantly produced by the government confirmed, a federal agent entered the powwow and seized eagle feathers worn by Petitioners Soto and Russell. Petitioners filed a motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for a summary judgment on the issue of whether the Government violated the Free Exercise Clause of the First Amendment and RFRA, as applied to Petitioners' right to the free exercise of their American Indian religious beliefs.

## DECISION OF THE U.S. DISTRICT COURT

On February 21, 2013, the U.S. District Court for the Southern District of Texas, McAllen Division, ruled against the Petitioners and in favor of the government based on the government's asserted "compelling interest."

### B. Statement of Facts

### 1.  The Petitioners.

All individual Petitioners are American Indians as defined by a federal law that also counts them as American Indians on the 2000 decennial census.  The definition set forth is designed "to enhance the accuracy of the demographic information collected by the Federal Government" and "to monitor civil rights enforcement and program implementation" relative to American Indians.[2]

In fleshing out the law, the Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs makes three important points.  First, American Indian is defined as: "A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment."  Moreover, Central and South American Indians should be classified as American Indian and the category referred to as "American Indian or Alaska

---

[2] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.

Native" should be modified to include the original peoples of Central and South America.[3]  Second, "racial and ethnic categories . . . should not be interpreted as being primarily biological or genetic in reference.  Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry. . . Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest extent possible, recognizing that some data collection systems observer identification is more practical."[4] And third, "(t)he term American Indian should not be changed to Native American."[5]

Petitioners Robert Soto, Veronica Russell, and Homer Hinojosa III also assert their American Indian identity as members of the Lipan Apache Tribe of Texas, a state-recognized tribe.[6] Other named Petitioners are American Indian organizations wherein members of American Indian tribes, communities, churches, and dance groups can practice their sincere American Indian religious beliefs.

---

[3] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.

[4] Id.

[5] Id.

[6] (*See* Texas Senate Resolution 438 and  Texas House of Representative Resolution 812 Attached).

Petitioner Rev. Robert Soto is a religious leader among the American Indian Petitioners. He is an enrolled member of the Lipan Apache Tribe of Texas, a state-recognized tribe. He is also Vice Chairman of the Lipan Apache Tribe of Texas.

In his role as an American Indian religious leader, he serves as Pastor of McAllen Grace Brethren Church, Native American New Life Center, and San Antonio Indian Fellowship. He is a founder and dancer with the South Texas Indian Dancers Association, which performs at American Indian religious services, ceremonies, and events.

Petitioner Michael Russell is a Muscogee Creek Indian and the brother-in-law of Rev. Soto. His wife Plaintiff Veronica Russell and their two sons are enrolled members of the Lipan Apache Tribe of Texas. He, his wife, and sons are all members of the South Texas Indian Dancers Association. The remaining Petitioners are participants in American Indian religious services, ceremonies and events organized, sponsored and led by Rev. Soto and his tribe.

**2. The Powwow.**

On March 11, 2006, United States Fish and Wildlife Service Agent Alejandro Rodriguez entered a powwow held at the Palm View Community Center in McAllen, Texas. A powwow is an American Indian religious service and cultural event. The powwow was sponsored by members of the Lipan Apache Tribe of Texas.

Using a Department of Interior regulation that bans all American Indians not enrolled in federally-recognized tribes from possessing or using feathers or parts of birds listed on the Migratory Bird Treaty Act (MBTA)[7] and Bald and Golden Eagle Protection Act (BGEPA)[8] for their religious ceremonies, the Agent seized eagle feathers belonging to Rev. Robert Soto and Michael Russell, who were participating as dancers in the powwow.

Specifically, the Agent seized two Golden Eagle feathers that were worn in a ceremonial roach headdress by Reverend Robert Soto, who was participating at the powwow as a Feather Dancer (also known as a Fancy Dancer) and a Hoop Dancer. Next, the Agent seized a ceremonial bustle with 42 Golden Eagle feathers belonging to Rev. Soto and worn by Michael Russell, who was participating at the powwow as a Traditional Dancer. The Agent also seized four other Golden Eagle feathers belonging to Mr. Russell.  Two of the feathers were Helushka (Warrior) feathers and two were worn in a ceremonial roach headdress.

The feathers seized are considered by American Indian Petitioners sacred objects essential and central to their sincere American Indian religious beliefs and practices.

---

[7] 16 U.S.C. § 1371, 1372.
[8] 16 U.S.C. § 703.

The Agent issued a citation to Rev. Robert Soto for possessing two Golden Eagle feathers in violation of the BGEPA, and the Migratory Bird Treaty Act. Rev. Soto was <u>not</u> assessed any fine.

The Agent also issued a citation to Michael Russell for the one bustle made of Golden Eagle feathers and the four other loose Golden Eagle feathers in violation of the BGEPA and MBTA.   Mr. Russell was assessed a fine for $500, which he paid.

### 3. The Government's Stipulations.

In a United States Department of Interior Letter (Attached as Exhibit A), by Janet Spaulding, Esq., dated December 8, 2011, RE: Supplemental Petition of Remission, Attorney Spaulding stated the following:

1. In a companion case,[9] "the parties had stipulated that the powwow was a religious service." (at page 2)

2. "I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow (at page 3).

3. "It is undisputed that Michael Russell, Mr. Soto's brother-in-law, wore the golden eagle bustle and (had) possession of four single golden eagle feathers owned by Rev. Soto with Rev. Soto's permission." (at page 3)

---

[9] *U.S. v. Michael Cleveland*, Magistrate Action No. M06-4806-1.

4. "It is undisputed that Mr. Soto allowed a person who is not a member of a federally recognized Indian tribe to take possession of his bustle made from golden eagle feathers as well as four loose golden eagle feathers." (at page 3)

5. "I find that although Rev. Soto is a sincere religious practitioner of Native American religion, the federal government's compelling interest in limiting the right to legally possess eagle feathers for religious purposes to members of federally recognized tribes prevents any mitigation of the seizure of the golden eagle feathers involved in this matter." (at page 9)

### 4. Motion for Summary Judgment.

McAllen Grace Brethren, et. al., moved for summary judgment on all of the claims in their First Amended Complaint pursuant to Fed. R. Civ. P. 56. Petitioners' counsel discussed the ground for this motion and the relief requested with counsel for the government in March 2012. Government's counsel opposed the relief requested, but agreed to the cross-filing of motions for summary judgment. In support of a judgment in their favor, Petitioners stated the following:

# Summary of Argument

The overarching issue in this case is whether an American Indian not enrolled in a federally recognized tribe can practice an American Indian religion, using and possessing eagle feathers[10] that are central and essential to the religion?

The U.S. Department of Interior (hereinafter referred to as "the government" or "the DOI") says No, asserting a compelling interest on two grounds: (1) It is protecting Indian culture, by limiting Indian religion to only a minority of Indians—i.e., members of federally recognized tribes; and (2) It is protecting eagles, even though it permits members of federally recognized tribes to kill eagles.[11]

The appealing Indians contend the government is suffocating Indian culture by preventing the majority of Indians (those not enrolled in federally-recognized tribes) from practicing their Indian religion. Moreover, Plaintiffs assert that they pose absolutely no threat to eagles because they are asking for only "molted" (or naturally shed) feathers. Because of the government's regulations, millions of eagle feathers that are "molted" or shed naturally each year are left to on the ground to rot.

# Argument and Authorities

---

[10] Eagle feathers are used to carry prayers to the Creator, cleanse and heal the body and spirit, and honor and protect guardians of American Indian religion and culture.

[11] *See* Associated Press, "Feds allow tribe to kill two eagles," *San Antonio-Express News*, March 14, 2012, p. A3.

## Standard of Review

This facial challenge to the constitutionality of the policy of the U.S. Fish

and Wildlife presents a purely legal issue. The Court of Appeals reviews de novo a

district court's conclusions of law. *Williams v. Kaufman County*, 352 F.3d 994,

1001 (5th Cir. 2003). "Recognizing that first amendment problems present

intertwined questions of law and fact, Fifth Circuit precedent prescribes de novo

review of the district court order." *Bailey v. Morales*, 190 F.3d 320, 322 (5th Cir.

1999); see also *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste*

*Mgmt. Auth.,* 389 F.3d 491, 497 (5th Cir. 2004) ("[r]eview of questions of

constitutional law is de novo"). Petitioners seek *de novo* review.  This Court should

reverse.

## Argument and Authorities

In 1884, the United States outlawed American Indian religions.  Indians

caught participating in powwows, potlatches, sun dances, sweat lodge and tipi

ceremonies or wearing feathers of their sacred birds were arrested and

imprisoned.[12]  As Professor Robert Clinton[13] noted, on Indian reservations, "early

---

[12] *See* Rules Governing the Court of Indian Offenses, Department of Interior, Office of Indian Affairs, March 30, 1883, and Price, Hiram, Commissioner of Indian Affairs, Department of Interior Letter, December 2, 1882.  Indians 201: Indians, Eagles and the Law, Native American Netroots, *Daily Kos Group*, June 7, 2012, http://www.dailyko.com/story/2012/06/07/1098233/-Indians-201-Indians-Eagles-and-the-Law, downloaded April 4, 2013.

[13] Robert N. Clinton is the author of *American Indian Law: Cases and Materials* (Third Edition), Michie Company, Inc., 1991.  He currently serves as the Foundation Professor of Law at the

examples of internment or concentration camps," Indians were denied their federal rations, as well. "Thus, the federal government's message to tribal Indians was crystal clear—abandon your traditional culture . . . *or starve.*"[14]

In 1933, the war on Indian religions briefly abated when John Collier, Franklin Roosevelt's Commissioner of Indian Affairs, eliminated the bans on Indian dances and other customary practices.[15]

However, in 1940, the war on Indian religions took on a new dimension with the passage of the Bald and Golden Eagle Protection Act. Under the Act, the government had the power to issue regulations restricting the taking, possessing and transporting of bald and golden eagles and their parts. These regulations have had direct impact on traditional native peoples who consider the eagle to be sacred and who use eagle feathers for religious purposes. As with most federal legislation impacting Indians there was neither testimony from Indians nor any consideration of Indian religions. The Act made the use of eagle feathers a federal offense.

---

Sandra Day O'Connor College of Law at Arizona State University, and he is an Affiliated Faculty member of the ASU American Indian Studies Program. He also serves as Chief Justice of the Winnebago Supreme Court and as an Associate Justice for the Colorado River Indian Tribes Court of Appeals, the Hualapai Tribal Court of Appeals, and the Hopi Court of Appeals and as Judge *pro tem* for the San Manuel Band of Serrano Mission Indians. He also served for 20 years as an Associate Justice of the Cheyenne River Sioux Tribal Court of Appeals, as well as temporary judge or arbitrator for other tribes, and acted as an expert witness or consultant in Indian law. *See* http://robert-clinton.com/, downloaded April 17, 2013.

[14] *See* Clinton, Robert, "Code of Indian Offenses," Posted in *History of Federal Indian Policy, Indian Law*, February 24, 2008, http://rclinton.wordpress.com/2008/02/24/code-of-inidan-offenses/, downloaded 4/12/2013.

[15] *Id.* The modern version of the Code of Indian Offenses is found at 25 C.F.R. Part 11.

Under the Act, individual spiritual leaders and traditional practitioners were persecuted.[16]

In 1978, the Bald and Golden Eagle Protection Act was amended, allowing the government to permit Indians to possess and use eagle feathers and parts for Indian religious practices and ceremonies.  Nowhere in the statute did it say "only Indians enrolled in federally recognized tribes can possess and use the feathers." After passage of the Act, the government instituted a permit system that operated for more than twenty years without any regulation requiring an applicant to be a member of a federally recognized tribe.[17]

However, the government used its discretion to deny permits to *any* Indian not enrolled in a federally recognized tribe.  For those enrolled in federally recognized tribes, fewer than two percent (2%) ever received permits from the government for their feathers.[18]

It also should be noted that the government extended its permit system to cover nearly 1,000 other species of birds listed on the Migratory Bird Treaty Act (MBTA),[19] further limiting the use of bird feathers by Indian people. Only a few hundred permits were issued for non-eagle feathers.

---

[16] Daily Kos Group, *loc. cit.*
[17] See *In the Matter of Joseluis Saenz, v. Dept. of Interior*, No. 00-2166 (10th Cir. 2000). *Also see* Footnote 46.
[18] *See* Stokes DaShanne, "Eagle feathers and the imperialist conquest of state-recognized tribes," *Indian Country Today*, p. 5, 8-13-08.
[19] 16 U.S.C. § 1371, 1372.  The MBTA lists Bald and Golden Eagles as protected species.

In 1999, during a federal lawsuit deciding whether an American Indian not enrolled in a federally recognized tribe can possess eagle feathers,[20] the government issued regulations, stating *only* members of federally recognized tribes can possess and use eagle feathers and parts for religious practices and ceremonies,[21] thereby officially shutting off access to feathers to the majority of American Indians in the United States.

On March 11, 2006, an agent of the government entered Petitioners' powwow in McAllen, Texas seizing sacred feathers resulting in this case.

**The Government's action violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).**

The Department of Interior (DOI) offends the Indians' senses and sincere American Indian religious beliefs with its regulation prohibiting non-enrolled Indians from the possession and use of eagle feathers essential and central to the practice of their American Indian religious beliefs. Moreover, the Indians assert that the government's action violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).

In 2010, in the case of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,[22] the U.S. Court of Appeals for the Fifth Circuit agreed with the U.S. District

---

[20] See *In the Matter of Joseluis Saenz, v. Dept. of Interior*, No. 00-2166 (10th Cir. 2000). *Also see* Footnote 45.
[21] *Id.*
[22] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (5th Cir. 2010).

14

Court of the Southern District of Texas and held that a local government regulation that "offends the sincere religious belief" of a member of the Lipan Apache Tribe of Texas was invalid under Texas Law.

In this particular case, a five-year-old boy and his parents were planning to move to Needville, Texas, a small town located forty-five miles southwest of downtown Houston. The father and the boy were members of the Lipan Apache Tribe of Texas.  In keeping with the boy's and his father's American Indian religious beliefs, the boy had never cut his hair. His parents wanted assurance that the boy could continue to wear his hair long at school, and they contacted the school district in Needville concerning its dress code.

The school district had a grooming policy, which, among other things, provided that "[b]oys' hair shall not cover any part of the ear or touch the top of the standard collar in back." The policy's stated design was "to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority."

The parents challenged the school district's dress code as it applied to their son.  Although the school district agreed that the boy had a sincere religious belief in leaving his hair *uncut*, it argued that the evidence demonstrated that there was no sincere belief in wearing his hair visibly long. Thus, the school could require him to wear his uncut hair in ways that best conform his appearance to that of male students who cut their hair to meet dress code requirements.  According to the

school district, even though some Americans Indians keep their hair long and in braids as a tenet of their sincere religious beliefs, "other Native Americans fasten their long hair in buns or otherwise obscure their hair so that it is not visibly long. If those Native Americans can comply with their religious beliefs in that way, the District assert(ed) that (the Lipan Apache boy) can, too," such as in a bun on top of his head or in a braid tucked inside his shirt.

In deciding the case, the Court turned to the Texas Religious Freedom Restoration Act (TRFRA), which evolved out of RFRA. Both RFRA and TRFRA are "a response to a . . . federal kerfuffle over the level of scrutiny to apply to free exercise claims under the First Amendment of the United States Constitution."[23] In 1990, the Supreme Court held, in *Employment Division, Department of Human Resources of Oregon v. Smith*[24] that the First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct.

Responding to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA)[25]. RFRA expressly adopted the compelling interest test as set forth in a pair of Supreme Court cases, *Sherbert v. Verner*[26] and *Wisconsin*

---

[23] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (5th Cir. 2010).

[24] *Employment Division, Department of Human Resources of Oregon v. Smith,*[24] 494 U.S. 872, 874 (1990). This is a case that challenged the use of sacramental peyote in the Native American Church.

[25] 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, 42 U.S.C. § 2000bb(b)(1).

[26] *Sherbert v. Verner,*[26] 374 U.S. 398, 399–402 (1963).

*v. Yoder.*[27]  That test "prohibits '[g]overnment' from 'substantially burden[ing]' a

person's exercise of religion even if the burden results from a rule of general

applicability unless the government can demonstrate the burden "(1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest."[28] As originally

enacted, RFRA applied to both federal and state governments, "but notably lacked

a Commerce Clause underpinning or a Spending Clause limitation to recipients of

federal funds."[29]

     In *City of Boerne v. Flores* in 1997,[30] the Supreme Court invalidated RFRA

as applied to the states and their subdivisions, finding that Congress had exceeded

its remedial power under the Fourteenth Amendment to delineate the scope of

constitutional violations.  Even though the *City of Boerne v. Flores* held that RFRA

no longer applied to states and their subdivisions, it still applied to the federal

government.

     Unhappy with the results of the *City of Boerne Case,* Texas passed TRFRA

which mirrored RFRA, reinstating "the same protections to religious free exercise

envisioned by the framers of its federal counterpart, RFRA," and applying the

---

[27] *Wisconsin v. Yoder*, 406 U.S. 205, 221–29 (1972).
[28] *City of Boerne v. Flores*, 521 U.S. 507, 515–16 (1997) (quoting 42 U.S.C. § 2000bb(b)(1); brackets in original)
[29] *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).
[30] *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997).

language of RFRA to the State of Texas and its subdivisions (including school districts).

1. **The government's regulation substantially burdens the appealing Indians' free exercise of religion.**

In *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, the Court wrote that to succeed on a RFRA-type[31] claim, Plaintiffss "(h)aving demonstrated a sincere belief,[32] must also demonstrate (1) that the government's regulations burden the plaintiff's free exercise of religion and (2) that the burden is substantial. If the plaintiff manages that showing, the government can still prevail if it establishes that (3) its regulations further a compelling governmental interest and (4) that the regulations are the least restrictive means of furthering that interest.[33]

The Court went on to state that a burden is substantial if it is "real vs. merely perceived, and significant vs. trivial"—two limitations that "leave a broad range of things covered." The inquiry should focus on "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression," as "measured . . . from the person's perspective, not from the government's."[34]

The Court also noted: "From federal precedent, we know that 'at a minimum, the government's *ban* of conduct sincerely motivated by religious belief

---

[31] In this case, it was the Texas Restoration Freedom of Religion Act or TRFRA.

[32] Attorney for the DOI has written: "I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow." (at page 3).

[33] A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist., 611 F. 3d 248 (5th Cir. 2010).

[34] *Id.*

substantially burdens an adherent's free exercise of that religion.' When conduct is subject to an outright ban, "alternative accommodations do not alter 'the fact that the rituals which [the adherent] claims are important to *him*—without apparent contradiction—are now completely forbidden.'"[35]

The Indians assert that the government's total ban on their possessing and using eagle feathers pursuant to their religious beliefs and practices is a substantial burden to them. In 1962, Congress recognized that burden, as well, and it provided a remedy with an exception in the Eagle Law so that all American Indians could practice their American Indian religions and beliefs. In 1962, Congress wrote in an exception "to permit the taking, possession and transportation of (eagle feathers and parts) . . .for the religious purposes of Indian tribes."[36] Nowhere in the statute does it limit the exception to only members of federally-recognized Indian tribes. That limitation was engineered by Defendant's Agency, The U.S. Department of Interior, which has a long history of discrimination against American Indian religious beliefs and practices.

According to the 10th Circuit Court of Appeals: "Not until 1981, eighteen years after the regulation was first enacted, was the requirement that an applicant be a member of a federally-recognized Indian tribe clearly articulated. In 1981,

---

[35] *Id.*.

[36] 16 U.S.C. § 668(a), originally passed in 1940, see Act of June 8, 1940, ch. 278, 54 Stat. 250-251, the Eagle Act as amended in 1962, adding both protection of golden eagles and the exception at issue in this case for possession for the religious purposes of Indian tribes.

after a member of an Indian tribe that was not federally recognized requested a permit for eagle feathers, the Deputy Solicitor of the Interior issued a memorandum which stated that only federally-recognized Indian tribes constituted 'Indian tribes' under the BGEPA. Id. at 3-4; Aplt. App. at 189. It was only in 1999 that the regulatory language was changed to clearly reflect the requirement that an applicant must be a member of a federally- recognized Indian tribe. *See* 50 C.F.R. § 22.22 (1999)."[37]

The government's regulation has evolved to the point that a small minority of American Indians (specifically, those enrolled in federally-recognized tribes) has the right to the free exercise of an American Indian religion which uses feathers and parts of birds listed on the MBTA or BGEPA as essential and central to the practice of their American Indian religion.

According to the 2000 U.S. Census, 4,119,301 American Indians were counted. In 1999, the "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, counted 1,698,483 Indians enrolled in federally recognized tribes.  Thus, if all Indians enrolled in federally-recognized tribes were counted on the 2000 census (which was highly unlikely), nearly two-thirds of all Indians counted were not enrolled in federally-recognized tribes and thus not eligible for eagle feathers under the government's regulation.

---

[37] *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (D. NM 2000).

In yet another estimate of the American Indian population in the United States referred to in a 2000 10th Circuit Court of Appeals opinion, the Court noted that in 1995 there were 8.7 million "Americans who identify themselves as having Native American Ancestry." Under this count, more than three-fourths of all Indians were not enrolled in federally recognized tribes and thus not eligible for feathers under the government's regulation.[38]

In an effort to appear to be supportive of the Indian Tribe exception in the Eagle Act, the Defendant has made a token effort to collect eagle bodies, feathers, and bird parts for American Indian rituals through the creation of a National Eagle Repository at the Rocky Mountain Arsenal National Wildlife Refuge in Denver, Colorado.[39] It also has experimented with a repository for non-eagle species of listed on the MBTA.

By any reasonable measure, the National Eagle Repository is an abject failure. According to the Division of Migratory Bird Management, only 1.1 percent of all the members of federally-recognized tribes have eagle permits.[40] This means that **more than ninety-eight percent** of Indians the government claims it is

---

[38] *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (D. NM 2000) at Footnote 9.
[39] Draper, Electra, *"Eagle bodies, parts for Indian rites are collected, sent from Colo. Morgue," The Denver Post,* Posted Sep. 1, 2001, p. 1. *available at* http://www.denverpost.com/ci_13242945, (last visited Feb. 27, 2012).
[40] Stokes DaShanne, "Eagle feathers and the imperialist conquest of state-recognized tribes," *Indian Country Today*, p. 5, 8-13-08.

protecting with its regulations (i.e., members of federally-recognized tribes) have
not applied for and received eagle permits from the government.

Even more revealing, in *U.S. v. Cleveland* (2006)[41], Jeff Haskins, Chief of
the Migratory Bird Office for the U.S. Fish and Wildlife Service, indicated that his
office had issued only 182 permits only to Indians enrolled in federally-recognized
tribes for non-eagle feathers of birds listed on the MBTA. This means that **more
than ninety-nine percent** of Indians the government claims it is protecting with its
regulations (i.e., members of federally-recognized tribes) have not applied for and
received permits from the government for non-eagle feathers or parts of birds listed
on the MBTA.

Congress has explicitly declared a policy "to protect and preserve for
American Indians their inherent right of freedom to believe, express, and exercise
the traditional religions of the American Indian, . . . including but not limited to
access to sites, use and possession of sacred objects, and the freedom to worship
through ceremonials and traditional rites." The Indian Religious Freedom Act, 42
U.S.C. § 1996.  Clearly, this policy has not been implemented in good faith by the
government when it comes to American Indian possession and use of feathers of
protected species of birds.  A more reasonable conclusion is the government's

---

[41] *U.S. v. Cleveland*, Violation No ST34 W0889336, Magistrate Action No. M-06-4806 (D. Tex.
2007) at Footnote 33.

regulations are designed to deny American Indians access to feathers of birds listed on the MBTA and BGEPA.

**2. The government's interest in protecting eagle populations is not compelling under RFRA or the First Amendment.**

The government asserts a compelling interest for its regulation on two grounds: (1) protecting eagles, and (2) protecting federally-recognized tribes' culture.[42] Also, the government asserts "in furtherance of a compelling governmental interest" its policy "is the least restrictive means of furthering that compelling governmental interest."

Bald eagle populations have made significant recoveries since protections were established under the BGEPA. In 2001, it was noted that "the current nesting population of Bald Eagles has increased by more than a factor of ten since 1963."[43] Moreover, in 2007, the government removed the Bald Eagle in the lower 48 states from the List of Endangered and Threatened Wildlife.

More recently, on March 9, 2012, the U.S. Fish and Wildlife Service issued a permit allowing the Northern Arapaho Tribe of Wyoming to kill bald eagles for religious purposes.[44]

---

[42] Spaulding, Janet, U.S. Department of Interior Letter, dated March 8, 2011. Also, see *U.S. v. Wilgus*, 297 F. 3d 116 (10th Cir. 2002).
[43] Appellee Joseluis Saenz, En Banc Rehearing, 102 F. 3d 1043, 1046 (10th Cir. 1996).
[44] *San Antonio Express-News*, "Feds allow tribe to kill two eagles," March 14, 2012, P. A3.

The Indians appealing consider the preservation of protected species of birds as paramount.  From the beginning, Petitioners have taken the position that they have no desire to harm or kill any birds listed on either the MBTA or BGEPA, nor are they seeking permission to do so.  It is not necessary. It is estimated that there are 80,000-110,000 Bald Eagles in the wild[45] and another 30,000 Golden Eagles in the United States alone.[46]  Each eagle has in excess of 7,000 feathers it sheds each year through a natural process called "molting".  This means there are literally millions of eagle feathers shed annually by live birds. Under the current government regulation, American Indians cannot pick up a single feather shed by eagles from off the ground without a government permit—a permit the government denies to the vast majority of our Indian people.  Because of the regulation and the burdensome permit requirements, millions of eagle feathers that could be used in American Indian religious practices remain uncollected and on the ground each year subject to destruction by humans, the elements of Nature, and other sources.

Moreover, eagle populations in zoos and aviaries regularly shed feathers, as well.  Too often, their feathers are put in the trash or burned by the establishments that house these birds.

[45] Alaska Trekker, *Alaska's Bald Eagles: Eagles are as common as pigeons in Southeast Alaska*, *available at* http://alaskatrekker.com/eagles.htm. (last visited Feb. 24, 2012).

[46] Indian County Today, McNeel, Jack, *Coeur d'Alene Elders View Golden Eagle Release*, Oct. 14, 2011, p. 3. Available at http://indiancountrytodaymediannetwork.com/2011/10/14/coeur-dalllllene-elders-view-eagle-release-58412#ixzzinJZvbyNS, (last visited Dec. 24, 2012).

Also, there are many eagles that die from natural causes, such as old age or illness.  Others are victims of road kill, pollution, electrocution, wind farms, illegal poaching by non-Indians, and many other causes whose feathers and body parts could be used for American Indian religious practices and ceremonies. Most of these birds are never recovered by the government or any other agency for a wide range of reasons—mostly because it is illegal, impractical, and costly.

Because of (1) the Bald and Golden Eagle population recovery, (2) the government's removal of the Bald Eagle from the List of Endangered Wildlife, (3) the vitality of today's eagle populations, (4) the government's recent permitting of the killing of bald eagles by the members of the Northern Arapaho Tribe of Wyoming, and (5) the government's ineffectual ability to provide permitted feathers and eagle body parts to any American Indian, the government has no compelling interest in denying Plaintiffs or other American Indians feathers and body parts of birds listed on the MBTA and BGEPA for religious purposes to any American Indian.

Petitioners challenge the government's regulation as "the least restrictive means of furthering" the government's asserted "compelling interest." Plaintiffs propose even lesser restrictive measures than the government's regulation. These measures would mean greater supplies of feathers for our Indian people and more effective management of our bird populations. These measures include:

***First,*** let American Indians collect and gather feathers shed by living birds without government harassment and intervention. Under this proposal, eagles are not harmed, killed or threatened in any way.

***Second,*** let American Indians themselves serve as stewards of their sacred bird populations, along with the government, by developing their own aviaries. American Indian eagle aviaries and sanctuaries are viable operations, serving Indians wishing to acquire eagle feathers. In recent years, the government has issued permits to a handful of Indians to keep live eagles, including the Zuni Pueblo in New Mexico, Iowa Tribe of Oklahoma, Comanche Nation of Oklahoma, Citizen Potawatomi Nation of Oklahoma, Navajo Nation Zoo and Botanical Park in Arizona, Jemez Pueblo in New Mexico (2 tribal members have permits for small aviaries), San Carlos Apache Nation in Arizona (has received a grant for a refuge), and Fort Belknap Indian Reservation in Montana (will open a sanctuary).[47]  Before enactment of the Eagle Protection Act in 1940, nearly every family at the Zuni Pueblo had its own eagle. These eagles were treated as members of the household. According to one source: "The longest lifespan I've heard of for any eagle was one that died at 56 after being cared for by succeeding generations of a Zuni family."[48]

---

[47] *See* Woodward, Stephanie, *Indian Country Today*, "Eagles E.R.," October 17, 2012, pp. 28-31. Until the enactment of the Eagle Protection Act in 1940, nearly every family of the Zuni Pueblo had its own eagle. *See also:* San *Antonio Express-News*, "Tribe: Bald eagle permit a victory for tradition." March 18, 2012, P. A12.
[48] *Id.*

It is believed that Zuni traditional eagle husbandry made that longevity possible.[49]

Plaintiffs believe this practice should be expanded, encouraged and supported by

the government for other tribes and Indian communities, as well. Because of the

veneration Indians have for their winged brothers and sisters, they would serve as

ideal guardians of these species listed on the MBTA and BGEPA.

3. **The government's asserted compelling interest in preserving American Indian culture and religion for federally-recognized Indians is contradicted by its regulation prohibiting the use of bird parts for religious purposes by a majority of American Indians.**

Petitioners contend that the government's regulation prohibiting the use of

feathers and bird parts of birds listed on the MBTA and BGEPA for Petitioners'

religious purposes contradicts the government's so-called "compelling interest" in

preserving American Indian culture for those enrolled in federally-recognized

tribes. How can American Indian culture and religion be preserved when the

government denies that culture and religion to a majority of American Indians?

We embrace the U.S. District Court's and 10th Circuit Court's position in the

*Joseluis Saenz Case* as a more reasonable approach.  In the *Saenz* Case, the courts

held that the government cannot "give religious preference to one group of Native

Americans over another."[50]

---

[49] *Id.*
[50] *U.S. v. Wilgus*, 297 F. 3d 116 (10th Cir. 2002).

27

**4. The government's definition of American Indian violates RFRA and the First Amendment when it enforces the BGEPA and MBTA concerning the use of eagle feathers considered essential and central to the practice of the American Indian religion.**

The federal government has used and continues to use several different definitions for American Indian. All but one includes American Indians <u>not</u> enrolled in federally-recognized tribes. The following five definitions are submitted for review:

    1.    **An American Indian is defined as "A person having origins in any of the Original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.[51]**

This definition of American Indian was mandated to "be used by the Bureau of the Census in the 2000 decennial census. Other Federal programs (were directed to) adopt the (definition) as soon as possible, but not later than January 1, 2003, for use in household surveys, administrative forms and records, and other data collections."[52]

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it states:

---

[51] <u>Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs, available at http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity,".</u>
[52] Ibid. Effective Date.

"The racial and ethnic categories set forth in the standards should not be interpreted as being primarily biological or genetic in reference. Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry…

Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest extent possible, recognizing that some data collection systems observer identification is more practical."

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it further states:

"The **principle objective** of the review has been to **enhance the accuracy of the demographic information** collected by the Federal Government." and "The **second element (is) to monitor civil rights enforcement and program implementation**." (Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

**"The term American Indian should not be changed to Native American."** (Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (12), OMB accepts the

29

following recommendations concerning the classification of Central and South American Indians, it states:

**"Central and South American Indians should be classified as American Indian.** (Bold print supplied)  The definition of the "American Indian or Alaska Native" category should be modified to include the original peoples of Central and South America."  In addition, OMB has decided to make the definition for the American Indian or Alaska Native category more consistent with the definitions of other categories.

**2**.    **An American Indian is defined as a member of any federally or State recognized tribe, or an individual certified as an Indian artisan by an Indian tribe.**

This definition is used in the enforcement of a truth-in-advertising law that prohibits misrepresentation in marketing of Indian arts and crafts products within the United States.  The law is enforced by the Department of Interior (DOI). *See* Indian Arts and Crafts Act of 1990 (P.L. 101-644).

**3**.    **An American Indian is defined as" any individual who. . .irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands or groups terminated since 1940 (i.e., no longer federally-recognized) and those recognized now or in the future by the**

**State in which they reside, or who is a descendent, in the first or second**

**degree, of any such member,. . ."**

This definition is used for American Indians eligible for scholarship and

grant programs. *See* Indian Health Care Improvement Act (IHCIA), U.S.C. Sec.

1603(c).

**4.    An American Indian "shall. . .include all other persons of one-half**

**or more Indian blood" irrespective of their membership in a federally**

**recognized tribe.**

This definition is used for those Indians eligible for tuition loans for

vocational and trade schools. *See* Indian Reorganization Act of 1934 (IRA), 25

U.S.C. Sec. 476, 479, and 471.  Also *see In the Matter of Joseluis Saenz*, v. *Dept.*

*of Interior*, No. 00-2166 (10th Circuit).

**5.    An American Indian is defined only as a member of a federally-**

**recognized  tribe.**

This definition is used by the Department of Interior (DOI) for implementing

The Eagle Act, 16. U.S.C. Sec. 668(a), originally passed in 1940 and amended in

1962 and 1978 (with an exception for feathers and bird parts for "religious

purposes of Indian tribes").

Petitioners assert that, when it comes to the free exercise of religion, the

broadest definition of American Indian shall be used.  Thus, **Definition 1** whose

31

principle objective is to "enhance the accuracy of the **demographic information**

collected by the Federal Government," and the second element is **"to monitor the**

**civil rights enforcement and program implementation"** should be used for

determining Petitioners' rights to feathers seized in this case.

### Discussion of Indian Definitions

As noted above, Federal Law is inconsistent in its recognition of American

Indians.  Under one federal law, Petitioners are counted as an American Indian,

whereas, under another federal law (the law invoked by Special Agent Rodriguez

who seized Plaintiffs' feathers), they are denied such recognition.

**A.  The U.S. Decennial Census Definition of American Indian.**  In the

first instance, the law governing the U.S. Decennial Census has recognized and

counted Petitioners for more than three decades, along with millions of other

American Indians who are not enrolled members of federally recognized tribes.

The definition of "American Indian" used by the U.S. Census for this period was

derived through *self-declaration*.  It has evolved and been used in the U.S. Census

enumerations since 1960.  This *self-declaration* definition treats American Indians

for the purposes of the Census the same as other minorities, such as African-

Americans, Asians, and Hispanics.  According to the 2000 Census, the term

"American Indian and Alaska Native" refers to people having origins in any of the

original peoples of North and South America (including Central America), and

who maintain tribal affiliation or community attachment. It includes people who reported "American Indian and Alaska Native" or wrote in their principal or enrolled tribe.[53]

Moreover, *a person could choose more than one race on the 2000 U.S. Census*. As a consequence of this provision, the Texas American Indian population grew from 65,877 in the 1990 U.S. Census to 215,599 in the 2000 U.S. Census, an increase of 330 percent. At the same time, the United States American Indian population more than doubled from 1,959,234 in the 1990 U.S. Census to 4,119,301 in the 2000 U.S. Census.[54]

Nearly 60 percent[55] of those recognized and enumerated as American Indians in the 2000 U.S. Census were *not* enrolled in federally recognized tribes. They were from tribes that have been terminated by the federal government[56] or

---

[53] *The American Indian and Alaska Native Population: 2000*, U.S. Census Bureau, February 2002, p. 2.

[54] In Texas, 118,362 persons indicated that they were "American Indian and Alaska Native alone" and 97,237 persons indicated that they were "Native American and Alaskan Native in combination" with other races.

[55] *According to* "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, 1999, there were 1,698,483 Indians enrolled in federally recognized tribes.

[56] From 1953-1964, the government terminated its federal recognition of a total of 109 tribes and bands as sovereign dependent nations, which affected more than 12,000 Indians or 3% of the total population of the government's count of Indians enrolled in federally recognized tribes at that point in time (about 400,000 Indians). On the eve of termination, these Indians went to bed as enrolled members of federally recognized tribes. They woke up the next morning as non-Indians in the eyes of the government. However, this did not mean these people quit being Indian in their own eyes.

not granted recognition by the federal government.[57]  Others were children,

grandchildren, and great-grandchildren of enrolled tribal members, who did not

meet the sufficient blood quantum or were the progeny of parents that did not meet

the appropriate gender requirements for their children's admission into their

respective tribes, whereas others made up a large number of the lost generation of

American Indians adopted out during the 1940s-1970s, when extreme poverty in

Indian Country combined with high-handed government practices allowed the

federal government to remove Indian children from their biological parents and

give them to non-Indians to raise as their own.   And still, there were other

American Indians from Canada and Central and South America who now reside in

the United States who can never establish a legal claim as a member of a federally

recognized tribe because their ancestral homeland is outside the United States.

Their only option to be recognized and counted as an American Indian by the

federal government was through the U.S. Census.

**B.    A Definition of American Indian as Enrolled in a Federally-Recognized Tribe.**

Under this definition, the federal government asserts that one is an American

Indian entitled to worship with eagle feathers only if one is enrolled in a federally-

recognized tribe and if that person has applied for a permit to possess and use the

---

[57] These Indians include those from state recognized tribes, such as the Lipan Apache Tribe of Texas.

34

feathers.[58]   The Judge in a case similar to Robert Soto's case, *In the Matter of Joseluis Saenz vs. The Department of Interior*,[59] stated that the government's "draconian" use of federal recognition to determine who could worship with eagle fathers conflicted with reality.   Moreover, the wordings of the laws-The Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act-made no mention of federal recognition. Instead, the laws simply say, "Indian tribes."   He also wrote that the government's use of federal recognition in issuing permits to own eagle feathers was little more than a bureaucratic shortcut.   "In the end, (it) appears the present system was designed to minimize the work Congress has handed to the agency . . . Administrative expediency, however, does not constitute a compelling government interest."[60]   The "federal recognition" definition of American Indian is not only the narrowest definition of "American Indian."[61]   It is also the most arbitrary and capricious of the definitions of American Indian.

---

[58] The number of federally recognized tribes has never been static.  In 1987, Russell Thornton noted *American Indian Holocaust and Survival: A Population History Since 1492*, University of Okahoma Press, 1987, at p. 190, that there were at that time "some 300 federally recognized tribes in the United States."  Today, there are approximately 570 federally recognized tribes in the United States.  Currently, there are more than 200 American Indian tribes that have petitioned the federal government seeking federal recognition.  More than 20 of those tribes already have state recognition.  *See* Johnson, Troy, "U.S. Federally Non-Recognized Indian Tribes—Index by State,": http://www.kstrom.net/isk/maps/tribesnonrec.html, accessed 6-12-03.

[59] In the Matter of Joseluis Saenz vs. Department of Interior, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S District Court in New Mexico, D.C. No. 99-21-M.

[60] *Ibid.  Also see* "War on feathers: fruitless drug raid becomes federal holy war," http://www.greatdreams.com/apache-indian-rights-2001.htm.

[61] In addition to the two federal definitions of American Indians discussed herein, there are 69 North American Tribal Entities which are recognized by individual states but not by the U.S. *See* http://en.wikipedia.org/wiki/List_of_State_Recognized_Tribal_Entities, accessed 6-29-06.

To illustrate, one year a person of full-blood Indian ancestry might be enrolled in a federally recognized tribe. The next year that tribe may no longer have federal recognition, making that full-blood Indian a non-Indian in the federal government's eyes. Later on, federal recognition could be reinstated. This happened time and again between 1953 and 1964, when the federal government terminated 109 federally recognized tribes.

To be an enrolled member of a federally-recognized tribe often requires a validated genealogy to an ancestor on a specified tribal roll established by the federal government, as well as a blood-quantum requirement of "Indian-ness." In addition, a vote by the tribal government may be required in which the tribal government agrees to accept the individual into its tribe.[62]

When it comes to the blood quantum requirement, the many tribes have a wide range of degree of tribal blood required for enrollment in the tribe. One tribe may have a requirement as high as one-half degree of tribal blood born to an enrolled member of the tribe, as with the Duckwater Shoshone Tribe,[63] whereas

---

[62] At the Winnebago reservation, counsel witnessed tribal council votes to not admit those who met all the requirements for enrollment, but had been adopted out to non-Indians. One of the arguments to reject their application came from an elder on the council who said, "If their parents didn't want them, then we don't want them either." This was an especially vexing development in light of the efforts of so many tribal members that pushed hard for the passage of Indian Child Welfare Act of 1978.

[63] *See* Thornton, Russell, *American Indian Holocaust and Survival: A Population History Since 1492*, University of Oklahoma Press, Norman, OK, 1987, pp. 191-192. *Also see* Thornton, Russell, *The Cherokees: A Population History*, University of Nebraska Press, Lincoln, NE, 1990, p. 140-141.

another tribe may have a requirement so low as to be any amount of Indian blood, no matter how small, with a pedigree to an ancestor on a federal roll, as with the Cherokee Nation of Oklahoma, or it may be a quantum anywhere between the extremes (such as one-quarter, one-eighth, one-sixteenth, one-thirty-second and so on).[64]

Historically, tribes have been known to shift blood-quantum requirements to disenroll segments of their respective populations for political purposes. In 2003 at the Isleta Pueblo, tribal leaders decided to raise the blood quantum for tribal enrollment and impose a rigid one-half blood quantum requirement for membership. They informed tribal members already enrolled in the tribe who did not meet the new one-half blood quantum requirement that they would be disenrolled.[65] In 2004 at the Redding Rancheria, the tribal council went ahead and disenrolled one-quarter of its membership. In both the Isleta Pueblo and Redding Rancheria cases disenrollment of tribal members was pushed because of disputes related to the distribution of casino profits.[66]

Then, there are those cases in which an applicant for tribal membership that met all the requirements of membership in terms of blood quantum and ancestry as

---

[64] *See* Thornton, Russell,
[65] "Isleta Pueblo enforcing blood quantum requirement," *Winnebago Indian News*, December 27, 2003, p. 1.
[66] "Dave Anderson finally sworn in as head of BIA, *Winnebago Indian News*, February 7, 2004, p. 1.

traced to the appropriate roll was not permitted membership in the tribe for a very different political reason, although the reason was oftentimes tied to the scarcity of resources available for those already enrolled members.

For example, in the case of *Santa Clara Pueblo v. Martinez*,[67] the United States Supreme Court upheld the ordinance of a tribe that denied membership to the children of female tribal members who married outside the tribe.  In this case Julia Martinez was a full-blood member of the Santa Clara Pueblo, and she resided on the Santa Clara Reservation in Northern New Mexico.  She married a full-blood Navajo Indian with whom she had several children.[68]  Even though she was a full-blood Indian and member of the tribe, and even though her children grew up on her reservation and were living there at the time of the lawsuit, the Court upheld the tribe's right to deny her children membership because their father was not Santa Claran.

Finally, there are American Indians who decline to participate in the enrollment process to become a member of a federally recognized tribe because of a belief that the Creator makes American Indians, not the federal government.  As American Indian activist Leonard Peltier commented: "This is not our way.  We never determined who our people were through numbers and lists.  Those are the

---

[67] *Santa Clara Pueblo v. Martinez,* 436 U.S. 49 (1978).
[68] *See* Robert N. Clinton, Nell Jessup Newton, and Monroe E. Price, *American Indian Law: Cases and Materials*, Third Edition, Michie Company, Publishers, 1991, p. 85. According to custom, Santa Clara Indians were patrilineal, whereas the Navajos were matrilineal.

rules of our colonizers, imposed for the benefit of our colonizers at our expense. They are meant to divide and weaken us.  I will not comply with them."[69]

## Significant Historical Background

The history of discrimination against American Indian religion and culture in the United States is long and sad.  In 1883, the Department of Interior's Commissioner of Indian Affairs Hiram Price declared that "the old heathenish dances" associated with American Indian powwows and other religious practices were "a great hindrance to the civilization of the Indians." Thereupon, he promulgated a *Code of Indian Offenses*, declaring all dances and feasts associated with Indian powwows and other religious ceremonies "Indian offenses." The *Code* specifically targeted American Indian religious leaders, ruling

> "The usual practices of so-called "medicine-men" shall be considered "Indian offenses". . ., and whenever it shall be proven. . .that the influence or practice of a so-called "medicine-man" operates as a hindrance to the civilization of a tribe. . .to prevent the Indians from abandoning their heathenish rites and customs, he shall be adjudged guilty of an Indian offense. . .(and) confined in. . .prison. . .until such time as he shall produce evidence. . .that he will forever abandon all practices styled Indian offenses. . ."

In 1887, the federal government attempted to "civilize" American Indians largely through the education of their children. In 1892, Captain Richard Pratt, the

---

[69] Statement by Leonard Peltier to Paulette D'Auteuil Robideou at Leavenworth Federal Prison, June 1991.  *See also* Ward Churchill, *Indians Are Us? Culture and Genocide in Native North America*, Common Courage Press, 1994, p. 106.

founder of the first Indian boarding school in Carlisle, Pennsylvania stated the objective of educating Indian children was to make certain "*that all the Indian there is in the race should be dead. Kill the Indian in him and save the man.*"

Since that time, Indian people have struggled to save their culture and religious practices. Today, many of our Indian elders remember a time when we held our powwows and other religious ceremonies in secret, all the while fearing the wrath of the federal government. In 1989, Petitioner Robert Soto and his family held the first open powwow in south Texas. In 2006, the fist of the federal government came down hard on our Indian community.

## Conclusion

Petitioners and American Indians throughout Texas pray the court renders a decision, keeping in mind that recent cases and law have begun to open the door for our Indian people to practice their religions beliefs without the repressive measures of the government.

In 2010, in the case of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* the U.S. Court of Appeals for the Fifth Circuit agreed with the U.S. District Court of the Southern District of Texas and held that a local government regulation that "offends the sincere religious belief" of an American Indian boy who wishes to wear his hear long was invalid under Texas Law.[70]

---

[70] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (5th Cir. 2010).

In 2000, *In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M, both the Court of Appeals and the District Court held an American Indian (Joseluis Saenz) who did not meet the requirements for enrollment in a federally-recognized tribe should be permitted to possess and use eagle feathers in American Indian religious ceremonies (such as powwows). Although Joseluis Saenz asserted he was an American Indian, he could not meet the requirements for enrollment in a federally recognized tribe. We wholeheartedly embrace the District Court's and Circuit Court's position in the *Saenz Case* that held that the government cannot "give religious preference to one group of Native Americans over another."[71]

Under the Religious Freedom Restoration Act (RFRA), laws have evolved in states, like Texas, where the majority of American Indians not enrolled in federally-recognized tribes have the same right to practice their American Indian religion as those enrolled in federally-recognized tribes. Today, these rights not only belong to all Indian boys wishing to wear their hair long at school, but these rights belong to members of the Native American Church who ingest sacramental

---

[71] The *Saenz Case* is distinguished from *U.S. v. Wilgus* and *U.S. v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) which involved non-Indians who had been prosecuted under the BGEPA for possession of eagle feathers without a BGEPA permit. Mr. Saenz self-identified as an American Indian, even though he could not meet the requirements for enrollment in a federally-recognized tribe. Wilgus and Hardman both identified as non-Indians practicing an American Indian religion that used eagle feathers as part of its worship and practices.

peyote because it is essential and central to the Church's religious observances and ceremonies,.

Also, in 2006, the U.S. Supreme Court ruled in favor of worshipers in a similar matter concerning the Uniao do Vegital religion permitting their ingesting of Hoasca tea as an essential and central element of their religion. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

## Prayer

For the reasons set forth above, Petitioners seek the following relief:

1. A judgment declaring the government's interpretation of the MBTA and BGEPA banning Petitioners' religious use of eagle feathers violates RFRA and the First Amendment's Free Exercise Clause of the U.S. Constitution.

2. A judgment declaring that the MBTA and the BGEPA does not apply to American Indians as defined under 62 FR 58782, whether enrolled in federally recognized tribes or not, and that all American Indians as defined under 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all eagle feathers.

3. A judgment declaring that the federal agent who entered the Mc Allen Powwow and seized the feathers of Rev. Robert Soto and Michael V. Russell on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds

of his legal authority because as American Indians as defined under 62 FR 58782

Rev. Robert Soto and Michael V. Russell were entitled to the feathers seized for

religious reasons and purposes.

4. A judgment declaring that the federal agent who raided the Mc Allen

Powwow and seized the feathers of Rev. Robert Soto and  Michael V. Russell on

or about March 11, 2006, at the premises at the Palm View Library and

Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted

beyond the bounds of his legal authority in violation of RFRA and the First

Amendment's Free Exercise Clause of the U.S. Constitution.

5. Return of the eagle feathers seized from Rev. Robert Soto and Michael

Russell.

Respectfully submitted:                    Dated: June 26, 2013

Respectfully submitted,
BY:  _/s/ Milo L. Colton
Counsel of Record
Nebraska Bar No: 19693
Civil Rights Legal Defense & Edu. Fund, Inc.
129 Whitney Way
Cibolo, TX 78108
Tel:  (210) 658-8539
Fax: (210) 492-1601

**Certificate of Service**

This is to certify that on June 26, 2013, the attached Brief of Appellants was filed

electronically. Notice of the filing will be sent to all parties by operation of the

Court's electronic filing system, including the Counsel listed below. Parties may

access this filing through the Court's system.

Jimmy Rodriguez, Assistant U.S. Attorney, Southern District of Texas, 919 Milam,

Suite 1500, P.O. Box 61129, Houston, TX 77208, **Attorney for Appellees**


/s/Milo L. Colton___
Attorney for Appellants

## Certificate of Compliance with Fifth Circuit Rules 25 And 32(A)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 9,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface and type style requirements of Fed. R. App. 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 word processing software in Times New Roman typeface, 14-point.

3. The PDF versions of this brief and the Record Excerpts that are being filed electronically with the Clerk of Court through the CM/ECF system, have been scanned for viruses and to my knowledge contain no viruses.

4. Pursuant to Fifth Circuit Rule 25.2.13, all required privacy redactions have been made.

5. Pursuant to Fifth Circuit Rule 25.2.1, any paper copies later sent to the Clerk of Court upon request will be exact copies of the electronic submissions unless otherwise directed by the Clerk of Court.

Respectfully submitted,                    Dated: June 26, 2013

By: /s/ Milo L. Colton

Milo L. Colton